# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **JASMINE BENDON** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **V.** | § | **CASE NO. 4:10-CV-615** |
| | § | |
| **BAC HOME LOANS SERVICING, LP** | § | **JURY TRIAL** |
| **AND BANK OF AMERICA, N.A.,** | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### *Jury Trial Requested*

Plaintiff files this First Amended Complaint against BAC Home Loans Servicing, LP and Bank of America, N.A., and in support respectfully states the following:

## PARTIES

1.     Plaintiff Jasmine Bendon is a resident of California.

2.     Defendant BAC Home Loans Servicing, LP ("Defendant BAC") is a Texas limited partnership with its principal place of business at 6400 Legacy Drive, Plano, Texas 75024. Defendant BAC has been served and is a proper party before this Court.

3.     Defendant Bank of America, N.A. ("Defendant BOA") is a national banking association organized under the laws of the State of Texas, with its principal place of business in Charlotte, North Carolina.  Defendant BOA regularly and routinely conducts business in the State of Texas, and its principal place of business in Texas is 2001 Ross Avenue, Dallas, Texas 75201. Defendant BOA has been served and is a proper party before this Court.

4.     Defendant BAC serves as the loan servicer for BOA mortgage loans.  Defendant BAC is the agent of BOA for purposes of the causes of action asserted herein.  Defendant BOA is

vicariously liable for the acts of Defendant BAC under the principles of agency and *respondeat superior*.  Because the duties and obligations of the Defendants are co-extensive, Defendants are collectively referred to herein as "Bank of America."

## JURISDICTION

5.      The court may exercise diversity jurisdiction over this action under 28 U.S.C. § 1332(a).  Diversity jurisdiction exists if there is "complete diversity between all named plaintiffs and all named defendants, and no defendant is a citizen of the forum State."  *Lincoln Prop. Co. v. Roche*, 126 S. Ct. 606, 610 (2005).  Moreover, the amount in controversy must also exceed $75,000. 28 U.S.C. § 1332(a).  Both conditions are met here.

## VENUE

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (c), and 1441(a), because:  (i) both Defendants are actively doing business in this State and are subject to personal jurisdiction throughout the State; (ii) both Defendants transact business in the State and in the District by and through the financing of mortgage loans in this State and District; and (iii) a substantial part of the acts, transactions, events, and/or omissions giving rise to the claims occurred in this District.

## BACKGROUND

7.      Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A § 5201, *et seq.* (2009).  In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  In return, Bank of America agreed

that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

8.      Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a Servicer Participation Agreement ("SPA") with the federal government, whereby Bank of America agreed to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.

9.      Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States.  Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.  Plaintiff Bendon is one of such homeowner.

10.     The guidelines issued by the Treasury Department set forth a detailed process whereby participating servicers such as Defendant BOA, acting through its Defendant BAC, effectuate the HAMP program.

11.     The servicer's first step is to ascertain eligibility.  A mortgage is eligible for HAMP if criteria enumerated in the Program Documentation are met: the loan must be a first lien

mortgage originated before 2009; the property must be occupied; the property must be the borrower's principal residence; the loan is delinquent or default is reasonably foreseeable; the borrower documents a financial hardship (as defined in the Program Documentation); and the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

12.    The servicer's second step is to calculate the loan modification.  If Bank of America, as servicer, determines that a mortgage borrower is eligible, it must apply the modification steps enumerated in the Program Documentation, in the stated order of succession, until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income. These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary).

13.    Third, after applying the enumerated modification steps to calculate the modified payment amount, Bank of America must offer the borrower a Trial Period Plan ("TPP").  The TPP consists of a three-month period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation.  Bank of America uses a standard form agreement to offer TPPs to eligible homeowners, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.  The servicer must provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions.

14.     If the homeowner executes the offered TPP Agreement, complies with all documentation requirements and timely makes all three TPP monthly payments, the fourth stage of the HAMP process is triggered, in which the homeowner *must* be provided the promised permanent modification. The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP.  Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of: (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared.  Once capped, the rate is fixed for the remainder of the term.

15.     In addition, HAMP and its associated directives also set restrictions on the way a servicer may report the borrower to credit reporting agencies.  For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period.

16.     Plaintiff Jasmine M. Bendon purchased her home May 17, 2007.  Her mortgage payments began June 1, 2007 with a monthly payment of $2,601.54.  At all times she has maintained the home as her personal residence; she resides in the home with her daughter, a minor.

17.     In early 2009, as a result of the decline in the economy, Ms. Bendon was informed by her employer that her salary and bonus opportunities would be significantly reduced.  While she had maintained an excellent credit rating due to her credit management practices, Ms. Bendon realized that due to changing earning potential she would need to alter her monthly debt service. She consulted a credit counselor, and was informed of the HAMP program.  She submitted her initial request to Bank of America for a modification through Cabrillo Economic Development

Corporation (CEDC), a HUD certified counseling agency.  At the time she submitted her application, she was still current on her mortgage payments.

18.     In April, 2009, shortly after submitting her application, the salary reductions at her place of employment were implemented.  Still awaiting word from Bank of America – and finding herself in a financial hardship – Plaintiff Bendon adjusted her W-2 to minimize federal withholding and maximize her net income.

19.      Finally, by letter dated July 28, 2009, Plaintiff Bendon received the HAMP modification packet from BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A., which contained a letter that stated:

> You may be eligible for a new affordable mortgage payment.
> **Complete the enclosed documents by August 11, 2009 to get started.**
>
> **. . .**
>
> **Based on an initial review of your current financial situation, you may be eligible for a loan modification as part of the federal government's Making Home Affordable Modification program to help homeowners**.  Under this program, we will determine your current financial situation to confirm whether we can help you by modifying your mortgage to give you a new affordable mortgage payment – now and into the future.
>
> **. . .**
>
> **Trial Period Plan / Modification Agreement.**  The Trial Period Plan is the first step.  Before the end of your Trial Period, we will finalize your modified loan terms and send you a loan modification agreement ("Modification Agreement"), which will reflect the terms of your modified loan.  In addition to successfully completing the Trial Period, you will need to sign and promptly return to us both copies of the Modification Agreement before your loan can be modified.

Plaintiff Bendon completed all the required paperwork, and submitted all the required documentation prior to the August 11, 2009 deadline.  At that point, she was still current on her mortgage payments.

20.     Enclosed in the package was a letter and documents that she filled out and returned to

start her in the Trial Period Plan.  The TPP started on August 11, 2009, and the first reduced

Trial Period Payment of $1,283.04 was due on that date.  The second Trial Period Payment of

$1,283.04 was due on September 1, 2009, and the third Trial Period Payment of $1,283.04 was

due on October 1, 2009.  Plaintiff Bendon timely made all three payments.

> The Home Affordable Modification Trial Period Plan agreement stated:
>
> If I am in compliance with this Trial Period Plan (the "Plan") and my
> representations in Section 1 continue to be true in all material respects, then the
> Servicer *__will provide me with a Home Modification Agreement__* ("Modification
> Agreement"), as set forth in Section 3, that would amend and supplement (1) the
> Mortgage on the Property, and (2) the Note secured by the Mortgage.
>
> . . .
>
> 3.  The Modification. . . . If I comply with the requirements in Section 2, and my
> representations in Section 1 continue to be true in all material respects, the
> Servicer *__will send me a Modification Agreement__* for my signature which will
> modify my Loan Documents as necessary to reflect this new payment amount and
> waive any unpaid late charges accrued to date.

(emphasis added).   Plaintiff Bendon met all the requirements set forth in the offer of loan

modification.

21.     In September 2009, having heard nothing back from Bank of America, Plaintiff Bendon

spoke with a Bank of America representative, and was advised that all documents had been

received and that she would hear back in October 2009.

22.     In October 2009, Plaintiff Bendon obtained a copy of her Experian credit report.  It stated

that she was past due on her mortgage as of August 2009.  The information in this credit report

differed markedly from – and was significantly more negative than – the information that Bank

of America was permitted to report regarding a consumer who was making payments in

compliance with a TPP.

23.     Despite the fact that HAMP prohibits acceleration or foreclosure proceedings from being instituted when the consumer is in compliance with the TPP, by letter dated November 10, 2009 Plaintiff Bendon received a Notice of Intent to Accelerate.  The letter stated that she was in serious default and needed to make a payment for the monthly and late charges in the amount of $5,794.32 by December 10, 2009 in addition to any other regular charges that would be due. The letter also stated that she should call immediately if she could not make the payment as options may be available to her to keep her home.  Plaintiff Bendon called Defendant Bank of America and spoke with a BOA employee, who informed her that she would have her final documents by January 17, 2010.  Plaintiff Bendon then tried contacting the President of Bank of America, and spoke with someone by the name of Chris Coburn.  He advised her he would escalate this matter to upper management as he could not help.  Distressingly, Plaintiff Bendon began to receive collection calls from Bank of America – despite the fact that the only reason she was "behind" on her mortgage payments was because of her participation in the HAMP modification program.

24.     After numerous additional phone calls to BOA, in February 2010 Plaintiff Bendon received a call from Collin Brookes at Bank of America, who advised her that her modification was fully approved.  Plaintiff then received a letter, dated March 30, 2010, stating, "**You qualify for a permanent modification of your home loan under the Home Affordable Modification Program**. . . . Thank you for meeting the terms of your Home Affordable Modification Trial Period Plan by providing your financial information and making your trial payments."

25.     But just when this should have been the end of the story, other Bank of America employees contacted Plaintiff Bendon to inform her that she was being denied a permanent modification.  Of course, the denial was not permitted by the provisions of HAMP, and was

directly contrary to the July and August 2009 modification offer than was made to Plaintiff Bendon by Bank of America.

26.     To add insult to financial injury, Bank of America informed Plaintiff Bendon that she had to pay Bank of America over $14,000 in order to bring her mortgage current – despite the fact that the only reason she was "behind" was because she accepted Bank of America's modification offer and because she made the lower trial payments as expressly directed by Bank of America.

27.     While working with Bank of America to try and sort out the confusion regarding whether the final modification was implemented (as reflected in the March 30, 2010 letter) or whether the final modification was denied (as orally stated by Bank of America representatives), Bank of America began to report Plaintiff Bendon to credit reporting agencies as significantly delinquent on her mortgage.

28.     During this ordeal, Plaintiff Bendon took other steps to address her financial difficulties. She made numerous attempts to restructure her debt by refinancing – at lower rates and longer terms – her car and boat loans.  However, she was denied refinancing because of the negative credit information that Bank of America was wrongfully reporting to the credit reporting agencies.  Plaintiff Bendon also approached Bank of America about a traditional refinance of her home mortgage.  She was told that she did not qualify for a refinance because she was behind on her mortgage – of course, the only way in which she was "behind" was because she was in full compliance with the TPP.

29.     Because Bank of America has refused to meet its contractual obligations, Plaintiff Bendon was wrongfully deprived of an opportunity to restructure her finances.  She has been deprived of lower mortgage payments and a lower mortgage interest rate under the Bank of America HAMP offer; she has been denied lower mortgage payments and a lower interest rate

on a traditional home refinance because of the negative credit information erroneously reported by Bank of America; she has been denied lower car and boat payments and a lower interest rate because of the negative credit information erroneously reported by Bank of America; and she has been denied extensions of credit and had her existing limits reduced because of the negative credit information erroneously reported by Bank of America.  Ironically, because she was mislead into making lower payments – resulting in negative credit information being placed on her credit reports and the accrual of late payments – she is actually in much worse position now than if she had never attempted to take advantage of the modification process.  In addition, she has suffered the mental anguish of being repeatedly informed that her home – which she shares with her minor daughter – will be foreclosed.  Defendants' wrongful actions must be corrected.

30.    Unfortunately, the wrongful actions taken by Bank of America are routine.  Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information. Borrowers who attempt to contact Bank of America by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call.  Bank of America regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.  Plaintiff Bendon experienced each and every one of these tactics.

## CAUSES OF ACTION

### COUNT I - BREACH OF CONTRACT / BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

31.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

32.    Bank of America entered into an individual contract with Plaintiff.  The modification agreement sent by Bank of America to Plaintiff constitutes a valid offer.  By executing the

Agreement and returning it to Bank of America, along with the supporting documentation, Plaintiff accepted Bank of America's offer. Plaintiff fully complied with the terms of the agreement, making all modified payments as required and fulfilling all other requirements. Plaintiff and Bank of America thereby formed a valid contract. By failing to offer Plaintiff the permanent HAMP modification, Bank of America breached that agreement.

33.     Plaintiff has suffered harm and has been threatened with additional harm from Bank of America's breach. By wrongfully denying the permanent modification, Bank of America has prevented Plaintiff from obtaining a lower interest rate and lower monthly payments on her home mortgage. Further, by accepting the offer and timely making the lower TPP payments both during and after the TPP, Plaintiff gave up the ability to pursue other remedies that would have resulted in lower payments, such as a traditional refinancing. Now, with the negative financial information that has been reported by Bank of America, and the resulting denials of credit, Plaintiff is unable to obtain a mortgage rate with terms like those offered by Bank of America as part of the HAMP modification.

### COUNT II - PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

34.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

35.     Bank of America, by way of its TPP Agreements, made a representation to Plaintiff that if she returned the TPP Agreement executed and with supporting documentation, and made her TPP payments, she would receive a permanent HAMP modification. Bank of America's TPP Agreement was intended to induce Plaintiff to rely on it and make monthly TPP payments. Plaintiff did indeed rely on Bank of America's representation by submitting TPP payments. Given the language in the TPP Agreement, Plaintiff's reliance was reasonable. Plaintiff's reliance was to her detriment. Plaintiff has yet to receive a permanent HAMP modification, and,

as a result of making the reduced payments has suffered harm to her credit rating, been denied loans, been denied more advantageous terms, had existing credit limits reduced, and suffered through collection activities instigated by Bank of America when it was well aware that Plaintiff was compliant with the modification agreement.

## COUNT III - VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 ET SEQ.

36.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

37.     The conduct of Bank of America as set forth herein constitutes unfair or deceptive acts or practices, including its practice of leading borrowers to believe that it will permanently modify their mortgage loans upon successful completion of a trial program.

38.     Bank of America's conduct as set forth herein has been unfair in violation of section 17200 because the acts or practices violate established public policy, and because the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

39.     Bank of America's conduct as set forth herein resulted in loss of money or property to Plaintiff.

## TRIAL BY JURY

40.     Plaintiff demands a trial by jury on all issues so triable.  A jury trial was originally and timely requested in the state court proceeding before this case was removed to this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bendon prays that, upon trial of this cause, she be awarded judgment against Defendants, and that such judgment provide all remedies and damages, at law and at equity, available to her, including monetary damages, specific performance, an award of attorneys' fees and costs, and pre-judgment and post-judgment interest.

Dated:  December 9, 2010                    Respectfully submitted,

/s/ Walt D. Roper
Walt D. Roper
State Bar No. 00786208
**THE LAW OFFICES OF WALT D. ROPER, P.C.**
3100 Monticello, Suite 500
Dallas, Texas 75205
972.755.2525
214.378.6670 (facsimile)
walt@roperfirm.com

R. Martin Weber, Jr.
State Bar No. 00791895
**CROWLEY NORMAN LLP**
3 Riverway, Ste. 1775
Houston, Texas  77056
713.651.1771
713.651.1775 (facsimile)
mweber@crowleynorman.com

**ATTORNEYS FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

        I hereby certify that on December 9, 2010, I electronically filed Plaintiff's First Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Walt D. Roper
Walt D. Roper